GEER, Judge.
Plaintiff Universal Cab Company, Inc.[1] appeals the trial court's dismissal of its claims on the grounds that it lacks standing. On appeal, plaintiff argues that the complaint adequately alleges an injury that is traceable to defendants' actions, that the injury to plaintiff resulting from defendants' actions is not conjectural or hypothetical, and that, at a bare minimum, plaintiff has standing to seek rescission of the taxi service agreements. After careful review, we hold that the trial court properly concluded that plaintiff's complaint failed to establish the second component of standing as set out in Neuse River Found., Inc. v. Smithfield Foods, Inc., 155 N.C.App. 110, 113, 574 S.E.2d 48, 51 (2002). Accordingly, we affirm the trial court's order granting defendants' motion to dismiss.
Facts
Plaintiff's amended complaint alleges the following facts. Plaintiff, a taxi company, has been serving the Charlotte region since 1992, and from around 1 July 1997 until about July 2011, plaintiff's taxis provided ground transportation services from the Charlotte airport pursuant to an operating agreement between plaintiff and defendant City of Charlotte ("defendant City")-the operating agreement was continuously renewed for over 10 years. The terms of the agreement provided that it "shall be deemed automatically renewed for successive one (1) year periods unless and until terminated by either party by giving written notice to the other no more than ninety (90) or less than thirty (30) days to the end of any calendar year."
On 12 October 2000, the airport informed plaintiff that its agreement would expire on 30 June 2001. However, on 11 June 2001, the airport advised plaintiff that "[t]he existing Agreement will now be extended on a month-to-month basis until a process of application and selection has been completed." After the process of application and selection was completed, plaintiff was selected to continue providing taxi services at the airport, and the parties' contractual relationship reverted back to the original, automatically renewing agreement subject to notice.
In June 2006, defendant City developed a plan for bringing the NASCAR Hall of Fame to Charlotte. Subsequently, Burhan Al-Shaikh, then manager of the City's Passenger Vehicle for Hire ("PVH") Office, called a meeting with all transportation companies providing services to defendant City at the time. Attendees at that meeting included Mr. Moustafa and owners of other transportation companies, defendant Timothy E. Newman (then CEO of the Charlotte Regional Visitors Authority ("CRVA") and ex officio director of the Greater Charlotte Hospitality and Tourism Alliance ("HTA")), and defendant Mohammad Jenatian (President of the HTA and member of CRVA Visitors Advisory Committee). At the meeting, defendant Newman told the transportation companies that the NASCAR Hall of Fame was going to lead to a considerable increase in tourism, so he insisted that vehicles used by the companies look nice and clean and asked that bigger transportation companies adopt NASCAR paint schemes on their vehicles.
Mr. Moustafa informed defendant Newman at the meeting that plaintiff would not change the paint scheme of its vehicles. Plaintiff alleged in its complaint upon information and belief that defendant Newman, defendant Jenatian, and others met in private after the mandatory meeting and used racial slurs in referring to Mr. Moustafa while agreeing they were "going to get his (Moustafa's) ass out of here."
Plaintiff also alleged that soon after the June 2006 meeting and continuing through 2010, defendant Newman began discussions with defendant Thomas J. Orr (who was at that time the Aviation Director for the airport) and defendant Jenatian about taxi service at the airport and their intention to eliminate plaintiff as a provider of taxi service. Plaintiff further alleged that defendant Orr had communications with the owners of defendant Taxi USA, LLC ("Yellow Cab") in which he agreed he would cause defendant Yellow Cab to become the sole provider of taxi service and took steps to control defendant Yellow Cab's application so he could unilaterally review and accept it.
Around 18 August 2010, defendant Orr issued a request for proposals ("RFP # 1") for taxi service at the airport. After receiving comments from representatives of the taxi industry, the City Council asked defendant Orr to change the date of responses and referred the matter to the Community Safety Committee ("CSC"), which was chaired at that time by defendant Patrick Cannon.
Around the same time, defendant HTA, through defendant Jenatian, approached Mr. Moustafa and other taxi service providers and told them their issues at the airport would go away and that they would secure operating agreements if they paid $5,000.00 to join defendant HTA as a corporate sponsor. Defendant Jenatian told Mr. Moustafa that many members of the City Council were HTA members and that he would also be working closely with defendants Orr and Newman, who would have decision-making authority regarding the operating agreements. Defendant Jenatian also approached other taxi companies promising they would win a contract if they agreed to pay $5,000.00 to join HTA as a corporate partner. Plaintiff joined defendant HTA, but not at the corporate level.
On 7 September 2010, the CSC convened to review RFP # 1. Plaintiff alleged that the CSC, at that meeting, reviewed fictitious complaints made by defendant Newman regarding plaintiff and the quality of taxi service presently available at the airport. On the same date, the City Council decided to issue a new request for proposals ("RFP # 2"). On 20 September 2010, defendant Orr issued RFP # 2, which specified six selection criteria regarding the applicant's taxi service experience, quality, and finances and relaxed certain applicant requirements. Plaintiff asserted that the criteria was relaxed so that defendant City Cab, a newly formed company, could qualify as a candidate. Plaintiff alleges that the stated intention of RFP # 2 was for defendant Orr "to enter into an Operating Agreement for Taxi Service with at least one but no more than three" companies. Plaintiff also alleges that defendant Orr selected defendant Newman as part of the Selection Committee for RFP # 2.
Nine companies, including plaintiff, submitted timely proposals in response to RFP # 2. Plaintiff asserts, without further explanation, that it "exceeded all of the other companies with respect to the Selection Criteria, and at a minimum was certainly in the top three candidates." On 18 October 2010, Bruce Hensley, a principal of Hensley-Fontana (corporate sponsor of defendant HTA) and a representative on the PVH board, sent an email to defendant Newman complaining about the maintenance of one of plaintiff's taxis. Plaintiff alleged in its amended complaint that defendant Newman collaborated with Mr. Hensley and one or more defendants to draft the email to undermine plaintiff's proposal in response to RFP # 2.
On 27 October 2010, the Selection Committee met to review the proposals to RFP # 2. Prior to that meeting, defendant Orr and his staff had reviewed the applications and selected five taxi companies that they felt were superior to the other four. Those five companies included defendants Yellow Cab, Crown Cab, City Cab, plaintiff, and King Cab. On 17 November 2010, the Selection Committee listened to presentations from the five companies, and plaintiff alleges that it "exceeded the other four companies who gave presentations to the Selection Committee" and that it "at a minimum was certainly in the top three candidates." In support of this allegation, plaintiff set forth a list of factors, including: its longstanding history as a taxi company in Charlotte, its "superior customer-service record as compared to the other candidates," its cab maintenance, its $250,000.00 line of credit obtained to upgrade its taxis, the technology it used for securing payment, and the small turnover it had with drivers compared to other candidates.
During plaintiff's presentation, defendant Newman asked about Mr. Moustafa's personal tax history, and he raised additional concerns regarding plaintiff afterwards. Plaintiff alleges that defendant Newman "knew at the time which proposals had been made by corporate sponsors of the HTA, and took action in concert with Defendant Orr to ensure that those corporate sponsors would be awarded the right to provide Taxi Service, and to undermine [plaintiff's] proposal in response to RFP # 2."
In its complaint, plaintiff refers to a deposition in another case in which a police officer member of the Selection Committee admitted that the Selection Committee did not analyze the applicants' proposals against the selection criteria. On 17 November 2010, the Selection Committee recommended to the City Council that defendant Yellow Cab, defendant Crown Cab, and King Cab all receive operating agreements. Plaintiff noted in its complaint that a complaint in another lawsuit alleged that internal airport records showed that defendants Yellow Cab and Crown Cab had consistently been the lowest-rated companies in terms of customer service at the airport. At the time of the Selection Committee's decision, defendants Yellow Cab and Crown Cab were both HTA corporate sponsors. Defendant Yellow Cab paid approximately $15,000 .00 between 2008 and 2010, and Crown Cab paid $20,000.00, with $10,000.00 being paid in 2010.
In February 2011, media reports announced that the owners of King Cab had prior felony convictions and had served time in federal prison in 2006. Plaintiff alleged that defendant Orr's staff was aware of the felony convictions before and during the RFP process. Defendant Orr told reporters he did not think the owners of King Cab were "a security issue" and still thought King Cab was one of the three best candidates to provide taxi services. The City Manager, however, directed that King Cab be eliminated from consideration; afterwards, defendant Orr unilaterally selected defendant City Cab as the third recommended taxi company for selection, although the company had only been in business for less than six months and its "financial information was somewhat thin."
Plaintiff alleges that defendant City Cab gave $5,000.00 to defendant HTA in 2011 "as part of a quid pro quo arrangement so that it would be selected to provide Taxi Service." In addition, 21 of defendant City Cab's drivers later contributed, as recently as October 2013, $225.00 each to defendant Cannon's campaign for mayor, totaling $4,725.00. Plaintiff alleged that these contributions were pursuant to a quid pro quo agreement with defendant Cannon to ensure defendant City Cab would be awarded a contract. In addition, plaintiff alleged that defendant Cannon's campaign also received a total of $32,000.00 in contributions from the owners of defendant Yellow Cab as part of a quid pro quo agreement.
On 28 March 2011, the City Council referred the matter back to the CSC. A councilmember (who is not a defendant) claimed at that time that none of the councilmembers had looked at the RFP documents, so a delay would "help us and build some credibility." Before the CSC met, defendant Cannon called defendant Orr to discuss and plan defendant Orr's presentation to the Committee. The Committee convened in May 2011 and selected defendants Yellow Cab, Crown Cab, and City Cab as its recommendations.
At the close of the May meeting, Mr. Moustafa asked defendant Cannon whether he had read plaintiff Universal's proposal, and defendant Cannon responded by asking when he was going to support democrats and gave him a card with a handwritten telephone number on the back. On 13 June 2011, the City Council voted to offer exclusive operating agreements to defendants Yellow Cab, Crown Cab, and City Cab, and on 15 June 2011, defendant Orr sent plaintiff a letter stating that "your Agreement will terminate effective Sunday, July, [sic] 17, 2011."
In 2011, after the contracts were awarded, Mr. Moustafa and at least one other cab company representative were approached by an individual claiming to represent defendant Cannon, who stated that plaintiff could again provide taxi service if it would make campaign contributions to defendant Cannon of $10,000.00 each. Plaintiff further alleges that sometime in May 2013, defendant Jenatian advised the owner of Diamond Cab that a $5,000.00 to $10,000.00 membership in defendant HTA would "level the playing field." Finally, in early 2014, defendant Cannon was indicted on corruption charges and pled guilty to the federal crime of "Honest Services Wire Fraud" in violation of 18 U.S.C. §§ 1343 and 1346.
Plaintiff filed its complaint on 12 June 2014 and an amended complaint on 11 July 2014. Plaintiff alleged, in its amended complaint, that it was the victim of a "systematic campaign by several of these defendants ... to prevent them from being allowed to fairly compete for, make or enforce an operating agreement with the City to provide Taxi Service at the Airport." Plaintiff alleged further that the "decision to deprive [it] of the right to provide Taxi Service was the product of corruption and/or favoritism, and constituted an abuse of discretion."
Plaintiff's amended complaint contained 11 causes of action. The first and second causes of action were asserted against defendant City for breach of contract and breach of the covenant of good faith and fair dealing. The third cause of action plaintiff asserted claims against defendants Newman, Jenatian, Cannon, and HTA for unfair and deceptive trade practices. Plaintiff's fourth and fifth causes of action were asserted against all defendants for antitrust violations and interference with contract. Plaintiff asserted two causes of action labeled as the "Sixth Cause of Action," the first against defendants Yellow Cab, Crown Cab, and City Cab for restitution and the second against defendants City, Yellow Cab, Crown Cab, and City Cab for rescission of contract. The seventh cause of action was asserted against defendants City, Orr, and Newman for violation of Article I § 19 of the North Carolina Constitution.
Plaintiff's eighth cause of action was asserted against defendants City, Yellow Cab, Crown Cab, and City Cab for a declaratory judgment ordering that the contracts awarded to defendants Yellow Cab, Crown Cab, and City Cab by defendant City are void and of no effect. Plaintiff asserted its ninth cause of action against defendants Newman, Jenatian, Cannon, and HTA for punitive damages. In its tenth cause of action, plaintiff asserted an action for civil conspiracy against all defendants, alleging that defendants "agreed to conspire, each with the other, to prevent [plaintiff] and Mr. Moustafa from obtaining an operating agreement to provide future Taxi Service at the Airport." Finally, plaintiff asserted as its eleventh cause of action that defendants Cannon, Jenatian, Crown Cab, Yellow Cab, City Cab, and HTA "engaged in a pattern of racketeering activity or, through a pattern of racketeering activities, or through proceeds derived therefrom, to acquire or maintain, directly or indirectly, an interest in or control of the Airport taxi enterprise" in violation of this State's RICO Act.
Defendants filed or otherwise raised motions to dismiss under Rules 12(b)(1) and/or 12(b)(6) of the Rules of Civil Procedure for lack of standing and failure to state a claim upon which relief can be granted. The trial court applied the test for determining a plaintiff's standing to assert a claim established in Neuse River and entered an order and opinion on 6 March 2015 ruling that plaintiff's non-contract based claims would be dismissed under Rule 12(b)(1) for lack of standing due to (1) a lack of a causal connection between plaintiff's alleged injury and defendant's alleged misconduct and (2) because plaintiff had only alleged conjectural or hypothetical injury, rather than actual or imminent injury.
The court found, in relation to the causal connection element, that plaintiff "[did] not allege any facts or offer any evidence to support [its] conclusory assertions concerning the City Council's alleged deference to these Defendants in awarding the Agreements." The trial court also pointed out that other than allegations concerning defendant Cannon, plaintiff "ha[s] not alleged or offered evidence that any Councilmember ... received bribes or other unlawful inducements from any Defendant, and [defendant] Cannon is the only Councilmember Plaintiff[ ] ha[s] elected to sue." The court concluded that since plaintiff failed to show "a causal nexus between [plaintiff's] alleged injury and Defendants' alleged conduct," it did not have standing to bring the claims. As for the actual or imminent injury element, the trial court pointed out that plaintiff was competing against many additional competitors-even beyond the defendant cab companies-and found "that there also exist intervening factors, that Plaintiff[ ] ignore[s]," which precluded a conclusion that plaintiff suffered an actual or imminent injury as required to establish the necessary elements of standing.
In addition, the trial court concluded that plaintiff's contract-based claims for breach of contract and breach of the implied covenant of good faith and fair dealing were barred by the statute of limitations. Accordingly, the court concluded that plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing should also be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief could be granted. Plaintiff timely appealed to this Court.
I
Plaintiff first contends that the trial court erred in dismissing its non-contract claims for lack of standing, under Rule 12(b)(1), on the ground that plaintiff did not plead sufficient facts or offer sufficient evidence showing a causal connection between defendants' conduct and plaintiff's injury.
This court "review[s] Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction de novo and may consider matters outside the pleadings." Harris v. Matthews, 361 N.C. 265, 271, 643 S.E.2d 566, 570 (2007). Where the trial court, as here, did not weigh evidence and make findings of fact, appellate review of an order dismissing an action under Rule 12(b)(1) for lack of standing is de novo. See Munger v. State, 202 N.C.App. 404, 410, 689 S.E.2d 230, 235 (2010) ("Since the trial court did not resolve issues of fact in determining that the Plaintiffs lacked standing ..., we review the trial court's decision to grant Defendant's motion to dismiss Plaintiffs' claims pursuant to N.C. Gen.Stat. § 1A-1, Rule 12(b)(1) using a de novo standard of review."). Further, "[i]n our de novo review of a motion to dismiss for lack of standing, we view the allegations as true and the supporting record in the light most favorable to the non-moving party." Mangum v. Raleigh Bd. Of Adjustment, 362 N.C. 640, 644, 669 S.E .2d 279, 283 (2008).
Here, all parties cite, and the trial court applied, Neuse River and its three-prong test for standing that requires a plaintiff to allege and prove:
"(1) 'injury in fact'-an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."
155 N.C.App. at 114, 574 S.E.2d at 52 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 119 L.Ed.2d 351, 364, 112 S.Ct. 2130, 2136 (1992) ).
This Court also emphasized:
"Since [the elements of standing] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."
Id. at 113, 574 S.E.2d at 51 (quoting Lujan, 504 U.S. at 561, 119 L.Ed.2d. at 364, 112 S.Ct. at 2136-37 ). Moreover, " '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " Id. (emphasis added) (quoting Lujan, 504 U.S. at 561, 119 L.Ed.2d. at 364, 112 S.Ct. at 2136-37 ).
Our Supreme Court, however, in Goldston v. State, 361 N.C. 26, 637 S.E.2d 876 (2006), overturned a decision of this Court applying Neuse River in a declaratory judgment action asserting taxpayer standing to challenge expenditures by the Governor and General Assembly. After concluding that taxpayer standing existed and that plaintiffs could bring a declaratory judgment action, the Supreme Court then noted that the decision in Neuse River, applied by the Court of Appeals in Goldston, 173 N.C.App. 416, 618 S.E.2d 785 (2005), erroneously relied upon the federal doctrine for standing set out in Lujan.
The Court of Appeals decision in Goldston, 173 N.C.App. at 421, 618 S.E.2d at 789, focused primarily on the first prong of Neuse River and whether an "injury in fact" had occurred. In reversing this Court, the Supreme Court compared the "injury in fact" language from the first prong of Neuse River and Lujan with a North Carolina Supreme Court decision, which, in addressing standing, held that " '[o]nly those persons may call into question the validity of a statute who have been injuriously affected thereby in their persons, property or constitutional rights.' " Goldston, 361 N.C. at 35, 637 S.E.2d at 882 (quoting Piedmont Canteen Serv., Inc. v. Johnson, 256 N.C. 155, 166, 123 S.E.2d 582, 589 (1962) ).
More recently, in Cedar Greene, LLC v. City of Charlotte, 222 N.C.App. 1, 7, 731 S.E.2d 193, 198-99 (2012), rev'd per curiam, 366 N.C. 504, 739 S.E.2d 553 (2013), a majority of a panel of this Court again applied the Neuse River three-prong test for standing to one of the plaintiffs' requests for a declaratory judgment invalidating a City policy. The dissenting opinion disagreed with the reliance on Neuse River, noting that "our Supreme Court in Goldston ... set a different standard" and concluding that the plaintiff had shown "a threatened or imminent injury" resulting from the policy. Cedar Greene, 221 N.C.App. at 17, 18, 731 S.E.2d at 204, 205 (J. Calabria, dissenting). The Supreme Court reversed "[f]or the reasons stated in the dissenting opinion[.]" 366 N.C. at 504, 739 S.E.2d at 553.
Both Goldston and Cedar Greene addressed the "injury in fact" prong of Neuse River in the context of a declaratory judgment action. In this case, we need not address whether plaintiff has sufficiently alleged an injury, but rather whether plaintiff has sufficiently shown that the injury arises out of the defendants' actions to establish the level of "adverseness" required under North Carolina law for standing. See Mangum, 362 N.C. at 642, 669 S.E.2d at 282 (" 'The gist of the question of standing is whether the party seeking relief has alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation[s] of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " (quoting Stanley v. Dep't of Conservation & Dev., 284 N.C. 15, 28, 199 S.E.2d 641, 650 (1973) )). See also Goldston, 361 N.C. at 35, 637 S.E.2d at 882 (requiring that plaintiff show that it was " 'injuriously affected [by a statute] in their persons, property or constitutional rights' " (quoting Piedmont Canteen Serv., Inc., 256 N.C. at 166, 123 S.E.2d at 589 ).
Even though the Supreme Court held in Goldston that "the nuts and bolts of North Carolina standing doctrine are not coincident with federal standing doctrine[,]" the Court also acknowledged that "federal standing doctrine can be instructive as to general principles." Id. We believe that the second prong of the Neuse River test is instructive in deciding whether an alleged injury is sufficiently tied to the challenged actions of a defendant to establish the "adverseness" required by North Carolina law. We, therefore, have reviewed plaintiff's allegations to determine whether plaintiff's alleged injury is " 'fairly traceable to the challenged action of the defendant[s].' " Neuse River, 155 N.C.App. at 114, 574 S.E.2d at 52 (quoting Lujan, 504 U.S. at 56061, 119 L.Ed.2d at 364, 112 S.Ct. at 2136 ).
Here, the challenged action of defendants as alleged by plaintiff is that defendants engaged in a "pay to play" scheme and that plaintiff did not get the airport contract because, with respect to some defendants, it did not make the solicited contribution to the HTA, and with respect to other defendants, it did not make the required political contribution to defendant Cannon's campaign. In addition, plaintiff claims the whole process was designed to increase the market share of defendant Yellow Cab, or at least that was defendant Orr's goal. The trial court, in its order, stated:
The Court concludes that Plaintiffs' allegations establish that a causal connection does not exist between the alleged injury about which Plaintiffs complain and Defendants' alleged conduct. Although Plaintiffs have alleged that Defendants engaged in numerous nefarious and wrongful acts that caused Plaintiffs' loss, it is undisputed that the decision that caused Plaintiffs' alleged injury was the eleven-member Charlotte City Council's decision not to award Universal a new Taxicab Operating Agreement.
(Emphasis added). Plaintiff continues to not dispute the italicized fact on appeal. The question we are left with, therefore, is whether the misconduct alleged in plaintiff's complaint is fairly traceable to the City Council's decision not to award plaintiff a taxi service agreement.
As plaintiff notes, the amended complaint describes defendants' alleged misconduct in detail. It also describes the process by which the other cab companies were selected. The trial court, though, effectively explained in its order what is missing from the complaint, stating:
{24} Plaintiffs have not alleged or offered evidence that any Councilmember, other than Defendant Cannon, received bribes or other unlawful inducements from any Defendant, and Cannon is the only Councilmember Plaintiffs have elected to sue. Plaintiffs have not alleged or offered evidence that the City Council vote to approve the Agreements was improper, illegal or invalid, or that any member of the City Council, other than Defendant Cannon, acted with any ill will, malice or improper motive against Plaintiffs or had any improper connection to any Defendant.
....
{26} Similarly, Plaintiffs allege that Defendant Cannon controlled the City Council's Community Safety Committee, but it is undisputed that Cannon could cast only one of the five votes on the Committee, and Plaintiffs do not allege or offer any evidence that any of the other members of the Committee received unlawful inducements to cast their votes for the Cab Defendants or that the Committee's vote was illegal or improper.
{27} Likewise, Plaintiffs allege that Newman-and through Newman, HTA-controlled the Selection Committee, but it is undisputed that Newman was only one of three votes on the Selection Committee, and Plaintiffs do not allege or offer any evidence that the two other members of the Selection Committee had any connection to either HTA or Cannon or had any improper reason to favor the Cab Defendants over Universal and the other competing taxi service providers.
Based on our review of the amended complaint, we agree with the trial court.
Plaintiff, in its reply brief acknowledges the critical legal issue:
The fundamental issue relating to Plaintiff's claims for damages is whether Plaintiff's pleadings, in order to pass muster under Rule 12(b)(1), must specifically detail the means by which the defendants involved in the pay-to-play scheme effected the result they promised, or whether numerous details of the scheme along with general allegations that the result was accomplished by means of fraud and corruption suffice.
While we agree with plaintiff that under Neuse River a plaintiff does not need to include all of the details of its underlying claims, the complaint must, however, include at least enough supporting allegations so that the trial court can trace defendants' conduct to the resulting decision at issue. Id. at 114, 574 S.E.2d at 51. See also Credigy Receivables, Inc. v. Whittington, 202 N.C.App. 646, 656, 689 S.E.2d 889, 896 (2010) (finding that plaintiff failed to satisfy both elements of Neuse River test and concluding "[the plaintiff's] injury is also not 'fairly traceable' to [the defendant] under the second element, because [the defendant] did not default on the credit card account underlying the default judgment."). An individual can claim to have influence or an ability to make promises or cause certain results to happen, when in fact, they really have no such power.
Thus, where, as here, the allegation is that defendants engaged in a pay-to-play scheme and other misconduct, there must be factual allegations in plaintiff's complaint establishing that the decision to award the taxi service agreements to other companies did in fact result from the alleged misconduct. The amended complaint in this case, however, does not include the allegations necessary to support the claims.
In addition, the amended complaint identifies a variety of motives of different defendants, rather than a systematic conspiracy or single form of misconduct. For example, the complaint alleges that defendant Newman wanted to make sure that plaintiff was excluded from obtaining an operating agreement, and this motive is also identified in the complaint as a driving force behind the civil conspiracy of all defendants to prevent plaintiff from being awarded a taxi service agreement. On the other hand, the complaint identifies defendant Orr's motive as being to increase defendant Yellow Cab's market share, whereas others-including defendants Newman and Cannon-wanted to condition the airport contracts on the payment of substantial contributions to defendant HTA. The complaint also alleges that defendant Cannon had the additional motive of wanting campaign contributions, noting that "the contributions of [defendant] Yellow Cab's owners to [defendant] Cannon's campaign were part of a quid pro quo agreement with Defendant Cannon to ensure that [defendant] Cannon would cause [defendant] Yellow Cab [to] be awarded a contract to provide Taxi Service." The complaint, therefore, does not contain an allegation of a systematic conspiracy or one form of misconduct.
Also, the complaint contains multiple references and allegations to other decision makers who are not defendants in this action, which undermines our ability to find a causal connection between defendants' misconduct and the ultimate decision in dispute. For example, plaintiff alleged that:
On or about August 23, 2010, after the City Council received comments from representatives of the taxi industry, the City Council asked Defendant Orr to change the due date of responses to RFP # 1. At the same time, the City Council referred the matter to its Community Safety Committee, which was then chaired by Defendant Cannon, who also at that time acted as the City's Mayor Pro Tem and was an HTA board member.
Then, a few paragraphs later, plaintiff alleges that on 7 September 2010, after the CSC convened to review RFP # 1, the City Council received a report from defendant Cannon regarding the CSC's meeting that day and "[a]t that meeting, the City's Manger, Curt Walton, decided that City staff would proceed with issuing a new [RFP] for Taxi Service at the Airport." Mr. Walton is not a defendant and has not been alleged to have engaged in any misconduct, yet this paragraph in the complaint specifically states that he was the one who decided defendant City would issue a new RFP.
In Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir.2012), the First Circuit noted that the second element of the standing test, as articulated in Lujan, 504 U.S. at 560-61, 119 L.Ed.2d at 364, 112 S.Ct. at 2136, "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm." Although Katz is a federal First Circuit case-and thus, not controlling-we find it helpful in articulating this element of standing. Katz also found that "[b]ecause the opposing party must be the source of the harm, causation is absent if the injury stems from the independent action of a third party." 672 F.3d at 71-72. Based on the principles Katz recognizes, the break in the causal chain caused by allegations involving third parties who were not named as defendants weakens our ability to trace the alleged misconduct to the actions of defendants, because plaintiff is unable to adequately show a direct causal connection between the alleged misconduct of defendants and the resulting decision in dispute.
Moreover, plaintiff alleges that the three-member Selection Committee, only one of whom is a defendant, met with defendant City and airport staff to review the proposals submitted for RFP # 2 on 27 October 2010. The complaint alleged further that prior to the Selection Committee's meeting with defendant City and airport staff, "[d]efendant Orr and his staff had reviewed the applications and selected five taxi companies which they contended were superior to the other four that had submitted responses to RFP # 2." Plaintiff cannot show any relationship between the alleged misconduct and that decision, however, because plaintiff was one of the five companies defendant Orr and his staff selected.
In addition, the amended complaint alleges that the Selection Committee "decided to invite the five companies pre-selected by Defendant Orr's office to make presentations to the Selection Committee." Since plaintiff was one of those five companies invited to make a presentation, this fact also provides no support to a finding that there was a relationship between alleged misconduct and that decision.
Ultimately, according to the complaint, the Selection Committee recommended defendant Yellow Cab, defendant Crown Cab, and King Cab. Although the complaint alleges that defendants Yellow Cab and Crown Cab were corporate sponsors of defendant HTA, the complaint does not allege that the other two members of the Selection Committee (besides defendant Newman) knew that fact. In addition, the complaint does not allege any ties between defendant Newman and the other two members of the Selection Committee or any influence he may have had over them. The complaint only alleges that defendant Newman served on the Selection Committee "for the purpose of promoting certain HTA members and sponsors including [defendants] Yellow Cab and Crown Cab, whose owners he knew personally, and to undermine proposals from companies that were not HTA corporate sponsors, including [plaintiff]."
The allegations in the amended complaint relating to King Cab also undermine a causal connection between defendants' misconduct and the ultimate decision at issue. Plaintiff portrays defendant Orr as the main decision maker, stating that defendant Orr "announced that he would continue to recommend King Cab to the City Council as one of the taxi companies who would be awarded a Taxi Service contract." Plaintiff, however, later alleges that it was the City Manager, Mr. Walton, who "removed King Cab from recommendation to the City Council...."
Plaintiff alleges that after King Cab was removed as a candidate, defendant Orr "unilaterally selected [defendant] City Cab as the third taxi company to be recommended for selection." Then, however, plaintiff alleges that based on defendant Orr's "recommendation," the City Manager replaced King Cab with defendant City Cab and the City Manager then "recommended that the City Council approve exclusive Taxi Service operating agreements at the Airport with [defendants] Yellow Cab, Crown Cab and City Cab." Although the complaint mentions meetings about this issue by not only the Selection Committee and airport staff, but also defendant City's staff, the complaint does not establish that the City Manager, who ultimately made the recommendation to the City Council, was tainted by the misconduct.
Plaintiff points to its allegation in the complaint that "Councilmember Mitchell stated in the March 28, 2011 City Council meeting at the time the Council decided to defer decision on the awarding of operating agreements, that 'between 2010 and 2011 none of us have opened up and looked at that RFP,' and that a delay in the decision-making process 'for the Public Safety [sic] to be our eyes to review that RFP would help us and build some credibility" and argues that it suggested that the City Council was going to send the case to the CSC. Plaintiff also alleged, in the very next paragraph of the complaint, that "[t]o the contrary, the City Council's deferring to the [CSC], controlled by Defendant Cannon, to be the Council's 'eyes,' ensured that Defendant Cannon and his co-conspirators would be the de facto decision makers with respect to the awarding of the contracts."
The first allegation, however, does not support the latter's inference that the Council was "deferring" to the CSC rather than seeking a recommendation from it. In addition, the complaint never fully articulates who is on the CSC other than defendant Cannon, and as he was only one of five votes on the committee, plaintiff never alleges or offered any evidence that other members received unlawful inducements to cast their votes. Moreover, plaintiff later alleges that defendant Orr "represented to the committee, in response to questions about whether HTA had influenced the selection process, that no one from HTA had contacted Defendant Orr or anyone else on the selection committee, despite the fact that Defendant Orr and Defendant Newman had been in communication about the taxi companies providing Taxi Service for years." This allegation indicates that the CSC was not controlled by the co-conspirators, because it states that defendant Orr was questioned about whether defendant HTA had influenced the selection process.
Furthermore, while the allegation above alleges that defendant Orr lied to the CSC regarding influence defendant HTA had on the selection process and the earlier allegations regarding defendant Orr theorize that he was the decision maker, plaintiff later alleges that "[t]he [CSC], relying on Defendant Orr's recommendations and due to quid quo pro [sic] exchanges and/or other unlawful conduct involving Defendant Cannon, recommended that [defendants] Yellow Cab, Crown Cab, and City Cab be offered exclusive agreements to provide Taxi Service." This paragraph, therefore, provides nothing more than allegations that attempt to trace the alleged misconduct to the CSC by citing reliance on defendant Orr's recommendation, but ultimately states that the decision was due to defendant Cannon's misconduct. Thus, the fair reading of this paragraph is that it is limited to defendant Cannon's misconduct, but not applicable to any other defendants.
Ultimately, plaintiff's amended complaint indicates that the City Council relied on the recommendations of defendant Orr and the CSC:
On June 13, 2011, relying on Defendant Orr's and the [CSC's] recommendations, and due to quid quo pro [sic] exchanges and/or other unlawful conduct involving Defendant Cannon and, upon information and belief, other members of the City Council, the City Council voted to offer exclusive Taxi Service operating agreements with [defendants] Yellow Cab, Crown Cab and City Cab.
Since the complaint does not adequately allege that the misconduct resulted in the CSC decision, the reliance on the recommendations is not enough to establish that defendants controlled the decision. Other than defendant Cannon, who was just one member, the only effort to trace the misconduct to the Council's decision is the allegation that "upon information and belief, other members of the City Council" received unspecified "quid quo pro [sic] exchanges and/or other unlawful conduct."
We conclude that this conclusory allegation based only "upon information and belief" is not enough to support standing because it does not establish that a majority of the Council engaged in misconduct or that the Council's vote was controlled by members who engaged in misconduct, and it does not tie the unspecified misconduct done by the unidentified members to plaintiff's injury. See Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs., 174 N.C.App. 266, 274, 620 S.E.2d 873, 880 (2005) (" 'We are not required, however, to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.' " (quoting Veney v. Wyche, 293 F.3d 726, 730 (4th Cir.2002) ).
Accordingly, after careful review of the amended complaint and finding that it contains a variety of motives, but no systematic allegation of conspiracy, and contains too many potential additional decision makers who were not identified as parties to the misconduct that led to plaintiff's injury, we hold that the trial court did not err when it concluded that plaintiff's amended complaint failed to include sufficient allegations of an injury fairly traceable to the actions of defendants. Because we hold that the trial court properly concluded that plaintiff's complaint failed to establish the second component of standing in the Neuse River test, we need not decide whether plaintiff adequately alleged an "injury in fact," the first element of the test. 155 N.C.App. at 114, 574 S.E.2d at 52.[2]
II
We next address plaintiff's argument that at a minimum, it at least has standing to seek rescission of the taxi service agreements. Generally, only a party or beneficiary can seek rescission, although plaintiff correctly points out in its reply brief that private citizens, as taxpayers, have standing to seek rescission of contracts entered into by municipalities. See Goldston, 361 N.C. at 33, 637 S.E.2d at 881 ("[O]ur cases demonstrate that a taxpayer has standing to bring an action against appropriate government officials for the alleged misuse or misappropriation of public funds ."). In the instant case, however, plaintiff did not allege that it was suing as a taxpayer, but rather argues that it referenced taxpayer standing in its brief as an example of a situation in which someone other than a party to a contract may seek rescission of a contract. Plaintiff has not, however, pointed to any authority that would allow it to have standing to seek rescission of the contracts. The trial court, therefore, did not err in concluding that plaintiff lacked standing to pursue a claim for rescission.
III
Plaintiff also argues that the trial court erred in dismissing its contract-based claims against defendant City for failure to state a claim for relief, under Rule 12(b)(6), on the ground that the claims were time-barred under N.C. Gen.Stat. § 1-53 (2015). Plaintiff, on appeal, concedes that these claims are time-barred under current law regarding the applicable statute of limitations, which is two years for contract-related claims against a municipality under N.C. Gen.Stat. § 1-53.
Nonetheless, plaintiff has included this issue simply to preserve it for review by our Supreme Court, arguing that a local government exercising proprietary functions should be subject to the three-year statute of limitations applicable to private entities. We agree that our current law supports the trial court's dismissal of those contract-based claims on statute of limitations grounds. See Jones v. Town of Angier, 181 N.C.App. 121, 125, 638 S.E.2d 607, 610 (2007) (finding "the North Carolina General Statutes contain a two-year statute of limitations for actions brought against a local unit of government upon a contract," and concluding that since "Angier is a local unit of government, plaintiff can only sue for any damages that have occurred within two years prior to filing the lawsuit...."). Since we are bound by the decisions of prior panels of this Court, we affirm the trial court on this issue. See In re Civil Penalty, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("[A] panel of the Court of Appeals is bound by a prior decision of another panel of the same court addressing the question, but in a different case, unless overturned by an intervening decision from a higher court.").
Conclusion
In sum, we hold that the trial court correctly concluded that plaintiff's amended complaint did not contain sufficient allegations of an injury traceable to defendants' misconduct, as required by Neuse River to withstand a challenge to standing. We, therefore, affirm the trial court's order dismissing plaintiff's amended complaint.
AFFIRMED.
Judges BRYANT and McCULLOUGH concur.
Report per Rule 30(e).

Plaintiff is owned and operated by Mohamed Moustafa, who was a plaintiff in the original action, but he has not individually appealed from the trial court's order.

Some defendants also argue that the complaint should be dismissed under Rule 12(b)(6) for failing to adequately allege the causes of action or because individual defendants are entitled to public official immunity. The trial court, however, did not base its dismissal on these arguments and, in any event, since we affirm the trial court's order we need not address them.